## Wahl v. Pittsburgh & Western Ry., Appellant.

*Ejectment—Title—Improvements—Estoppel—Evidence.*

Where there is evidence that the plaintiff in an ejectment saw defendant enter into possession of the land under the belief that he was taking a clear title, and saw him expend a large sum of money in improvements upon it, and gave no notice of his claim, the jury should be instructed that if plaintiff knew defendant had purchased and paid for the land believing the grantor had title thereto, saw him make expensive improvements upon it, and kept silent as to his own claim, he and those claiming under him are estopped as against defendant from setting up title.

*Estoppel—Witnessing deed—Presumption.*

The fact that a person claiming land witnessed a deed whose description

included the land claimed by him, will not estop the witness from subsequently asserting title to the land. There is no presumption in such a case that the description in the deed had been read to him.

Argued Oct. 18, 1893. Appeal, No. 168, Oct. T., 1893, by defendant, from judgment of C. P. Butler Co., Sept. T., 1893, No. 26, on verdict for plaintiff, Martin Wahl. Before GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and THOMPSON, JJ.

Ejectment. Before HAZEN, P. J.

The facts appear by the opinion of the Supreme Court.

Defendant's point was among others as follows:

"15. It being proved by a number of witnesses for defendant, as well as the fact that John Stewart was present at the execution of the deed by Mrs. Nixon in evidence, signed his name thereto as a subscribing witness, that the railroad company purchased and paid for the right of way, entered upon and expended its money and labor without notice or objection, he is estopped from denying the title of Mrs. Nixon, and the plaintiff claiming through Stewart has no better title than he had, is affected as Stewart was, and the verdict of the jury must be for the defendant. *Answer:* This is not affirmed, but is a question of fact for the jury to pass upon from the proofs adduced." [1]

Verdict and judgment for plaintiff. Defendant appealed.

*Errors assigned* were (1) instructions, quoting them, and (2) entry of judgment on verdict.

*John M. Thompson, R. P. Scott* with him, for appellant.— The submission of a legal question to a jury, or of matter shown by an unquestioned writing, is error: Foster v. Berg & Co., 104 Pa. 324.

Silence where it is the duty to speak may be estoppel: Rice v. Dewey, 54 Barbour, 455; Woods v. Wilson, 37 Pa. 379; Hill v. Epley, 31 Pa. 331; Logan v. Gardner, 136 Pa. 600; 7th Encyclopedia of Law, pages 12–13; Chapman v. Chapman, 59 Pa. 214.

Positive acts of encouragement, or which help to mislead, will raise an estoppel: Buchanan v. Moore, 13 S. & R, 304; Robinson v. Justice, 2 P. & W. 19; Putnam v. Tyler, 117 Pa. 570; Miller's Ap., 84 Pa. 391; Erwin v. Lowry, 7 Howard,

172; Kirk v. Hamilton, 102 U. S. 68; Close v. Cemetery, 107 U. S. 466; Carr v. Wallace, 7 Watts, 394.

Witnessing a deed is estoppel: Hall v. Skinner, 117 Mo. 474; Stevens v. Dennett, 51 N. H. 324.

*Lev. McQuistion, Everett L. Ralston* with him, for appellee, cited: Bigelow on Estoppel, 4th ed. 544; Wright's Ap., 99 Pa. 425; Alexander v. Kerr, 2 Rawle, 90.

OPINION BY MR. JUSTICE DEAN, November 6, 1893:

This is an ejectment by plaintiff against defendant for less than an acre of land in Evansburg borough, Butler county. The legal title from the commonwealth in 1836 passed by patent to Robert Boggs for a tract of four hundred and fifty acres, through which ran a stream known as Breakneck creek. In 1837, Boggs conveyed one hundred and fifty-six acres of this to Thomas Evans, designating the creek as the western boundary. Evans then laid out in lots the land embraced in the present borough. He adopted the creek as the western boundary of the lots.

In 1852, Charles Nixon entered into actual occupancy of about three acres of the Boggs tract not conveyed to Evans, on the opposite side of the creek. This occupation was probably a trespass when commenced, but Nixon built a dwelling house upon it, and other buildings, and lived upon it with his family, claiming the three acres as his own until his death in 1876. So it follows that whatever may have been the nature of his entry in 1852, at his death, in 1876, his title under the statute of limitations could not be questioned. The extent of his occupancy determined the extent of his ownership. His claim was to the creek as the eastern boundary, and so far as the land could be used for his purposes, he used it. He built a low stone wall as near the creek as he could, inclosing the land on that side, and his house was very close to the creek. In his will, he devised the land to his son Daniel, and described it as lying on the west side of the creek, and as bounded by the creek. Having made no provision in the will for his widow, Mary, she demanded her rights under the intestate laws, and, under the exemption act of 1851, the land was appraised and set apart to her. In 1877, she made an agreement with the

defendant, the Pittsburgh & Western Railway Company, giving it the right to locate its railway on any part of the land, designating as its eastern boundary Breakneck creek; the company then located its line on the land along the creek. Afterwards, in 1878, by a formal deed, she conveyed to it a right of way sixty feet wide on the land whereon the road was located, thirty feet from its centre line on each side. This embraced all the land between the creek and the railway.

The plaintiff claims title under one John Stewart, to whom Abraham Zeigler and wife conveyed by deed dated August 30, 1856, fifty-eight acres and ninety-nine perches of the one hundred and fifty-six acres of land originally conveyed by Boggs to Evans. We are not furnished in the paper-book with a copy of the deed from Boggs to Evans of October 14, 1837. In appellant's history of the case, it is stated to have conveyed the land on east bank of creek, making the creek the western boundary. There is no denial of this fact by appellee in his counter statement. Surveyor McQuistion, who ran the line in 1889 and 1890 for plaintiff, had the Boggs-Evans deed before him, and testifies there are errors in it; some of the bearings and distances have been left out; a part skipped; he is of opinion that the description takes in the land in dispute as part of the Evans land. If the Evans deed called for the creek as the western boundary, the plaintiff's land would extend no farther than the middle of the creek, and, without regard to defendant's title, he would have no right to a verdict for land on the opposite bank. But, assuming that the description of plaintiff's land would cover the west bank and the land in possession of defendant, the question then comes back to the extent of Nixon's occupancy on the west bank. The will of Charles Nixon makes a distinct assertion of occupancy to the creek as the eastern boundary; the agreement and deed of his widow with defendant fixes the same boundary. The fact, that the appraisers who set apart the land to the widow ran a line on the east along the bank of the creek, instead of calling for the creek, is without significance. If such a line had reduced the area claimed by her husband, it was no act of hers, defining the boundary, but that of the court which set apart for her the land. But the line in fact followed the creek on the bank and was really the creek line. She asserted the creek as her boundary in both the instruments executed to the company.

. Through all this mass of testimony, we do not find a word indicating any lim t short of the creek, from the time of Charlès Nixon taking possession in 1852, down to 1877, when it passéd into the possession of defendant.  Nixon built his stone wall on the summit of the creek bank, for the very sufficient reason that it was then above high water mark. . Landowners whose possessions are bounded by a stream do not set their fences. in the bed of the stream, or so near as to be swept away by the first freshet.  Against the most positive evidence of a notorious, uninterrupted, exclusive, hostile possession to the creek as a boundary, under claim of right, by Nixon and those claiming under him for almost forty years, there does not seem to have been any opposing evidence.

It was not disputed that Nixon had title to the land on which he resided, under the statute of limitations, but the evidence to establish it was just the same as that which fixed the creek as the eastern boundary of his claim.  The plaintiff's paper title to the strip between the creek and where he admits was the eastern line of Nixon, was no stronger than could 'have been asserted to the whole of Nixon's possession.  For, so far as appears, Nixon had no deed; as the land was patented in 1836, there was necessarily an outstanding paper title in some one to the whole of it; but, in view of the evidence as to the occupancy of Nixon, no one would pretend it could have prevailed.  Yet the plaintiff's paper title to the narrow strip was permitted to prevail against the undoubted occupancy for the statutory period by Nixon.  But as there was no prayer for peremptory instructions on this point, and therefore no exception or no assignment of error covering it, we take up the single assignment presented for our consideration.                              ;

There was evidence that John Stewart, under whom plaintiff claimed, in 1878 aided the railway company in procuring from Mary Nixon the deed for the land in dispute.; was present at its execution and signed as a subscribing witness.  He must therefore have known, at that time, the company purchased land from Mary Nixon, and paid its money on the faith of her title.  Knowing this, it was alleged by defendant, that, without notice of any claim on his part, he stood by while it made improvements and expended a large amount of money on the land.  In view of this evidence, defendant asked the court to

instruct the jury that plaintiff was estopped from now claiming the land as against the railroad company. The court refused the instruction, saying to the jury it was a question of fact for them to pass upon whether the plaintiff claiming under Stewart was estopped.

This answer is altogether too vague to so material a point. The fact that Stewart witnessed the deed of Mrs. Nixon is in itself of but little importance ; in so doing, he did not mislead defendant ; there would be no presumption from that fact that the description in the deed had been read by him. But defendant went further, and offered evidence that Stewart, acting for defendant, had solicited Mrs. Nixon to execute the conveyance, and had urged her to grant an additional ten feet in width. From all this evidence, the jury might have found that Stewart knew defendant had bought from Mrs. Nixon the very land to which he had an adverse title, and paid its money in the belief of her ownership. There was also evidence that afterwards Stewart saw defendant enter into possession of the land under the belief that it had a clear title, and expend a large sum of money in improvements upon it, yet never gave notice of his claim. The jury should have been instructed that if Stewart knew defendant had purchased and paid for the land believing Mrs. Nixon had title thereto ; saw them make expensive improvements upon it, and kept silent as to his own claim, he and those claiming under him were estopped, as against this defendant, from now setting up title. By such silence the railroad company ignorantly rested upon its title, believing it good ; expended its money in improvements. It was Stewart's duty to give warning: Crest v. Jack, 3 Watts, 239 ; Keeler v. Vantuyle, 6 Pa. 253 ; Chapman v. Chapman, 59 Pa. 214. The answer to the point being an insufficient statement of the law, and wanting in clear directions to the jury as to their duty to find the fact, the assignment of error is sustained, the judgment is reversed, and a v. f. d. n. awarded.