CALVIN HAGAN, C. J. HAGAN AND WILLIAM BATEMAN, PLAINTIFFS IN ERROR, vs. JOSEPH ELLIS, DEFENDANT IN ERROR.

1. Under the provisions of section 3, chapter 1869, approved February 27, 1872, limitation by adverse possession as against one deriving title from the United States begins to run from the date of the patent, and not from the date of the entry of or final payment for, the land embraced in such patent.

30

2. Equitable estoppels are proper defenses in actions of ejectment in this State, and evidence of such estoppels is admissible under the plea of not guilty.

3. Equitable estoppel, so far as it relates to the trial of title to land, is a doctrine by which a party is prevented from setting up his legal title because he has through his acts, words or silence, led another to take a position in which the assertion of the legal title would be contrary to equity and good conscience.

4. If one man knowingly, though he does it passively by looking on, suffers another to purchase and expend money on land, under an erroneous opinion of title, without making known his claim, he shall not afterwards be permitted to exercise his legal right against such person.

5. Where plaintiff in 1855 entered and paid for land from the United States, and in 1861 sold and delivered possession thereof under a bond for title to a third person, and for thirty years thereafter stood by and saw defendants and their predecessors tracing title from his vendee, purchase, claim, possess and improve the property under the belief, and some with positive assurances from plaintiff that he claimed no title to the property, during which time plaintiff made no claim to the property though living as a neighbor to the occupiers thereof, the plaintiff will be estopped from recovering possession of such property from the defendants, under a patent issued upon his original entry in the year 1891.

6. While the naked legal title to land of the United States remains in the government until the issue of a patent therefor, the beneficial ownership or equitable title is vested in an entryman from the time he receives a certificate of purchase from the government, showing full payment therefor.

7. A patent from the United States issued in pursuance of, and based solely and exclusively upon, a prior entry accompanied by full payment of the purchase price, does not convey to the entryman a new or independent title disconnected with his equitable title derived from such entry and final payment, but converts the imperfect or equitable title into a perfect legal one, enabling the patentee to seek and maintain legal remedies where therefore he was in the absence of statute confined to equitable ones.

Writ of Error to the Circuit Court for Holmes county.

### STATEMENT.

On March 16, 1893, defendant in error instituted in the Circuit Court of Holmes county, an action of ejectment against plaintiffs in error, to recover title to, and possession of, lots Nos. 1, 2 and 3 of section 20, Tp. 7 N., of R. 14 W., the declaration being substantially in the statutory form. Defendants pleaded not guilty upon which issue was joined, and a trial had at the Fall term of the court, 1893, resulting in verdict and judgment for plaintiff, from which this writ of error was taken. The evidence, all of which was admitted without objection, was to the following effect: Plaintiff testified that in 1854 or 1855 the land sued for was entered by him from the United States, under the "Graduation Act;" that he then paid all the purchase money and received a certificate from the government to this effect; that in 1861 or 1862 he sold the land to one T. Day, and gave him the certificate of purchase, and bond for title. Witness being in Elba jail, sold the land to Day to procure money to sue out a writ of *habeas corpus.* Witness did not sell the land to Day in good faith because Day never paid him all he was to pay for it. Witness had never been in possession of the land since he sold it to Day, nor did witness ever claim the land thereafter until he received his patent for it in 1891; nor did witness pay any taxes on it from the time he sold to Day until within two years of the trial. Witness secured his patent without being required to pay any money other than that paid when he entered the land. After witness sold the land to Day, the latter sold it to William Loftin; Loftin

sold to Adam Hicks; Hicks sold to Alexander Pate; and Pate sold to defendant, Calvin Hagan. Day, Loftin and Hicks died previous to the trial. The purchasers on down from Day went into possession of the land; and the defendants purchased it and had been in possession of it for ten or fifteen years previous to the trial, improving and cultivating it. Witness lived near the land most of the time and knew that the purchasers were in possession of and improving the land, and witness did not tell any of them that he claimed the land until he told the defendants. Witness did not tell Calvin Hagan, Alexander Pate, William Lindsay, nor any other person, that he had deeded the land to Day. Witness could neither read nor write. The patent referred to in plaintiff's testimony was introduced in evidence. It was executed by President Harrison on behalf of the United States of America, on April 13, 1891, and recited that Joseph Ellis, of Dale county, Alabama, had deposited in the General Land Office a certificate of the Register of the Land Office at Tallahassee, whereby it appeared that full payment had been made by said Joseph Ellis, according to the provisions of the act of Congress of April 24, 1820, entitled an act making further provision for the sale of the public lands, and the act supplemental thereto, for the lands sued for, among others, which had been purchased by said Joseph Ellis; in consideration of which the United States of America did thereby give and grant to said Ellis, his heirs and assigns, the tracts of land aforesaid.

Alexander Pate, on behalf of defendants, testified that he purchased the land in dispute from Adam Hicks, who had purchased it from William Loftin, and witness remained in possession of it until he sold

it to defendant Hagan, sixteen or seventeen years pre-
vious to the trial, and defendant and those holding un-
der him had been in possession of the land ever since.
Witness did not make Hagan a deed to the land, but
give him all the papers witness had concerning the
land, and put him in possession of it under the pur-
chase. At the time witness purchased the land from
Hicks, plaintiff told him that he had sold and deeded
the land to Day. Plaintiff made no claim to the land
then, and witness had never heard of his making any
claim until within the last year or two, or a short time
before the suit was brought.

William Lindsay and W. A. Bateman, on behalf of
defendants, testified that about a year before the trial
plaintiff told them that he had sold the land to Day
during the war, and had not claimed it since that time.
Bateman further testified that after the suit was
brought, plaintiff told him that he did not instruct his
attorney to bring suit for this land, but for another
parcel east of this land, but his counsel told him if he
sued for any he would have to sue for all.

Calvin Hagan, one of the defendants, testified
that he purchased the land in dispute from
Alexander Pate sixteen or seventeen years
previous to the trial, and that he and his ven-
dees and tenants had been in possession of it ever
since; that he had a grist mill, as well as a farm, upon
it; that the principal inclosures on the land were upon
lots 2 and 3, which were about fifteen acres of open
land. Only a small portion of lot 1 was under culti-
vation, but all the other portions of the same land not
enclosed had been used by defendant for procuring
fencing material, fuel, and for other usual farm pur-
poses, ever since defendant purchased it; plaintiff had

repeatedly told defendant that he had sold and deeded the land to Day during the war, and that he had no claim to it. Plaintiff lived about a mile from defendant when plaintiff purchased the land, and has lived near the land nearly ever since, and witness had never heard plaintiff make any claim to the land until about a year before the trial, although plaintiff and defendant had been neighbors and acquaintances, visiting each other, for a long time.

At plaintiff's request the court instructed the jury:. "If you find from the evidence that the plaintiff in this case acquired title by patent from the U. S. Government within less than seven years before the commencement of this action, then the defendants can not set up title by adverse possession against the title of the plaintiff."

The defendants requested the court to give five several instructions which were all refused, but no exception was taken to this ruling, except as to the second and fifth instructions, reading as follows: "2. If you believe from the evidence that the defendants, or those through whom he claims, that is, any of the previous owners through whom the defendants claim, had a written title to it, entered into possession of the land under claim of title, exclusive of any other right, and that there has been a continued occupation and possession of the land by the defendants, or those through whom they claim, for seven years previous to the institution of this suit, they were holding adversely to the plaintiff, and you will find for the defendant. 5. A man can not sleep over his rights for a long period of time when he has a legal right to enforce them, until innocent parties become involved, and then enforce his rights in the courts; so if you believe that

the plaintiff for thirty years stood by and saw other parties claiming title to the lands in question, cultivating and improving them thirty or more years, where there was no impediment to his bringing suit to recover them, and during that time made no claim to the lands, his claim becomes stale, and can not recover the lands, although he may have the legal title to it."

The defendants moved the court for a new trial upon various grounds, among others, that the verdict of the jury was contrary to the law and the evidence. Upon exceptions properly taken the plaintiffs in error here contend that the court erred in giving the special instruction on behalf of plaintiff, in refusing the special instructions requested by defendants, and in overruling the motion for a new trial.

The other facts in the case are stated in the opinion.

*D. L. McKinnon*, for Plaintiff in Error.

*W. O. Butler*, for Defendant in Error.

CARTER, J.:

I. The court very properly gave the instruction requested by the plaintiff, and refused the second instruction requested by the defendants. Plaintiff purchased these lands from the United States in 1854 or 1855, and received a certificate of purchase and full payment, but no patent was issued upon his entry until 1891. During the period intervening between the entry and the issue of the patent, the plaintiff was the beneficial or equitable owner of the lands, and the United States was the holder of the legal title. Upon the theory that the entryman in such cases is the real owner of the property from the time that he has com-

plied with all conditions entitling him to a patent, some
of the State courts hold that adverse possession will
begin to run against the entryman from the time he
becomes entitled to a patent, and not from the date of
the patent.    An illustration of this view will be found
in Dolen vs. Black, 48 Neb. 688, 67 N. W. Rep. 760.
On the other hand, the Supreme Court of the United
States has held, in a case very similar to the one at
bar, that time does not run against the government;
that no statute of limitation affects the rights of the
government unless there is an express provision to
that effect; that so long as the legal title is in the
United States, limitation by adverse possession can
not commence to run, and, therefore, in all actions of
ejectment in the United States Courts, adverse pos-
session under State statutes will be computed from the
date of the patent, and not from the date of the entry.
Redfield vs. Parks, 132 U. S. 239, 10 Sup. Ct. Rep. 83.
It is unnecessary for us to express an opinion as to the
merits of these conflicting views, because in the stat-
ute giving a limitation by adverse possession, under
which it is claimed by plaintiffs in error that the in-
struction given was bad, and the one refused good
(chap. 1869, approved Feby. 27, 1872), there is an ex-
press declaration that the cause of action commences
to run in such cases from the date of the patent, by
section 3, reading as follows:    "No cause of action or
defense to an action founded upon the title to real
property, or to rents, or to service out of the same,
shall be effectual unless it appear that the person pros-
ecuting the action or making the defense; or under
whose title the action is prosecuted or the defense is
made, or the ancestor, predecessor or grantor of such
person was seized or possessed of the premises in ques-

tion within seven years before the accruing of the right of action or defense in respect to which such action is prosecuted or defense made, or unless it appear that the title to such premises was derived from the United States or the State of Florida within seven years before the commencement of such action, and the cause of action shall not commence to run until the date of the patent issued by the State or the United States." The Circuit Court was carrying out the plain language and meaning of this section in its rulings upon the instructions complained of, and consequently committed no error.

II. The refusal of the fifth instruction requested by defendants, and the denial of their motion for a new trial, will be considered together. These rulings involve the questions, (A) whether, in ejectment, the defendant can avail himself of an equitable estoppel to defeat plaintiff's right of recovery upon a legal title; (B) whether an estoppel of this character can avail under a plea of not guilty; and (C) whether the evidence in this case was such as to require the court to give the fifth instruction requested by defendants, and to grant a new trial upon the ground that the verdict was contrary to the law and the evidence.

(A) In several of the States where common law and equity remedies are separate and distinct, equitable estoppels can not avail a defendant in ejectment, unless, perhaps, by equitable plea, where such pleas are allowed. Sedgwick & Wait on Trial of Title to Land, sec. 849; Newell on Ejectment, p. 675, sec. 47. In others, such estoppels are available in ejectment, as well as in other common law actions. Sedgwick & Wait on Trial of Title to Land, sec. 849; Newell on Ejectment, p. 675, sec. 48; Bigelow on Estoppel, page

682, *et seq.* This court has frequently applied the doctrine of estoppel in ejectment suits, and indirectly recognized such defenses as applicable to such actions, although, so far as we have been able to find, it has never passed directly upon the question now under consideration. Thus, in Coffee vs. Groover, 20 Fla. 64, we held that special pleas affecting the legal title or in estoppel, should be stricken out, because the plea of not guilty was broad enough to cover them; in Levy vs. Cox, 22 Fla. 546, we reversed a judgment in ejectment because the jury failed to give plaintiff the benefit of an equitable estoppel shown in evidence; in Coogler vs. Rogers, 25 Fla. 853, 7 South. Rep. 391, we reversed a judgment in ejectment because the jury had failed to give defendant the benefit of an equitable estoppel shown in evidence; and in Watrous vs. Morrison, 33 Fla. 261, 14 South. Rep. 805, the principles applicable to an equitable estoppel in evidence in that case were stated and applied. In the United States Courts, where common law and equity jurisdiction and remedies are still clearly and sharply defined, equitable estoppels are proper defenses in ejectment (Dickerson vs. Colgrove, 100 U. S. 578, and Kirk vs. Hamilton, 102 U. S. 68, followed by the Circuit Court of Appeals in Berry vs. Sewall, 13 C. C. A. 101); and we hold them so to be in this State.

(B) In Coffee vs. Groover, 20 Fla. 64, text page 78, we held that a special plea of *res adjudicata* (an estoppel by record) in ejectment should be stricken by the court *sua sponte*, or on motion or demurrer, holding that special pleas of matter affecting the legal title, or in estoppel only, incumbered the record and tended to embarrassment, as all such matters were admissible under the plea of not guilty. We think the same

rule applies to equitable estoppels, and that they are admissible under the plea of not guilty. Tyler vs. Hall, 106 Mo. 313, 17 South. West. Rep. 319; Mayer vs. Ramsey, 46 Tex. 371.

(C) In Hollingsworth vs. Handcock, 7 Fla. 338, we held that a party who negligently and culpably stands by and allows another to contract on the faith of an understanding of a fact which he can contradict he can not afterwards dispute that fact in an action against the person whom he had assisted in deceiving. Camp vs. Mozely, 2 Fla. 171, text 197. In Levy vs. Cox, 22 Fla. 546, we held that when a party claiming land, for which he has not received a conveyance, voluntarily directs a deed to be made to another person, he is thereby estopped from asserting title thereto as against an innocent purchaser thereof by regular conveyance from the sole heir of the person in whose name the deed was made. In Coogler vs. Rogers, 25 Fla. 853, 7 South. Rep. 391, we held that an equitable estoppel would arise in all cases where one, willfully, culpably or negligently, either by words or admissions, or by conduct, acts and acquiescence, separately or combined, caused another person to believe in the existence of a certain state of facts, by which such other person was induced to act, so as to change his own previous position injuriously. Equitable estoppel, so far as it relates to the trial of title to land, is stated by Sedgwick & Wait on Trial of Title to Land, sec. 843, to be "a doctrine by which a party is prevented from setting up his legal title, because he has through his acts, words or silence, led another to take a position in which the assertion of the legal title would be contrary to equity and good conscience." Terrell vs. Weymouth, 32 Fla. 255, 13; South. Rep. 429. In Dickerson vs. Colgrove, 100 U..

S. 578, Mr. Justice Swayne says: "The vital principle is that he who by his language or conduct leads another to do what he would not otherwise have done shall not subject such person to loss or injury by disappointing the expectations upon which he acted." In Wendell vs. Van Rensselaer, 1 Johns. Chy. 344, Chancellor Kent said: "If one man knowingly, though he does it passively by looking on, suffers another to purchase and expend money on land, under an erroneous opinion of title, without making known his claim, he shall not afterward be permitted to exercise his legal right against such person." And this principle, though often restated, has perhaps never been more clearly and succinctly given than in this language by Chancellor Kent; and it has been many times quoted and approved by judges and text writers. Neal vs. Gregory, 19 Fla. 357; Blodgett vs. McMurtry, 34 Neb. 782, 52 N. W. Rep. 706; Wahl vs. Pittsburg & Western Ry., 158 Pa. St. 257, 27 Atl. Rep. 965; Duke vs. Griffith, 9 Utah, 469, 35 Pac. Rep. 512; Mayer vs. Ramsey, 46 Texas, 371; 3 Kerr on Real Property, p. 2302; Bigelow on Estoppel, p. 547; 2 Rice on Evidence, p. 724; 6 Lawson's Rights, Remedies and Practice, sec. 2701; 2 Pomeroy Eq. Jur. sec. 818; Tiedeman on Eq. Jur. sec. 115; Wood on Limitations, sec. 61.

Viewed in the light of these principles, it is difficult to conceive of a stronger case of equitable estoppel than that furnished by the plaintiff's own sworn admissions in this case. Selling the land and delivering possession thereof to Day in 1861, though under a mere bond for title, he for thirty years thereafter, stood by and saw those tracing title from Day, purchase, claim, possess and improve the property, under

the belief, and some with positive assurances, that plaintiff claimed no title to the property, and during all these years the plaintiff made no claim to the property, though living as a neighbor to the occupiers thereof. True it is, that the patent, which invested plaintiff with the legal title to this land, did not issue until 1891, at which time plaintiff, for the first time after selling to Day, asserted a claim to the land; but it is a clear proposition that while the naked legal title was in the United States until the patent issued, the beneficial ownership or equitable title to the land was in the plaintiff from the year 1854 or 1855, when the government issued to him a certificate of purchase, showing full payment therefor. Witherspoon vs. Duncan, 4 Wall. 210; Cornelius vs. Kessel, 128 U. S. 456, 9 Sup. Ct. Rep. 122; Wisconsin Cent. R. Co. vs. Price County, 133 U. S. 496, 10 Sup. Ct. Rep. 341; Freeman on Executions, sec. 176; Tiedeman on Real Property, sec. 746; Mundee vs. Freeman, 23 Fla. 529, 3 South. Rep. 153. The patent being based solely and exclusively upon the original entry, without any new or other consideration, did not convey to plaintiff a new or independent title, disconnected with his former equitable title, but rather converted that which was before imperfect and equitable merely, into a perfect legal title, enabling plaintiff to seek and maintain legal remedies where theretofore he was, in the absence of statute, confined to equitable ones. Consequently the plaintiff being estopped from asserting his equitable title to the lands in controversy, we think the estoppel likewise extends to the legal title subsequently vesting in him by virtue of the patent.

The court erred in refusing the fifth instruction re-

quested by defendants, and in overruling the motion for a new trial. The judgment is reversed and a new trial granted.