LEWIS G. NORTON, AS TRUSTEE, *Appellant* v. MORNING JOHNSON JONES, *et al., Appellees.*

Opinion Filed January 27, 1922.

1. Laches may bar a suit to remove cloud from title.

2. Laches is an unexcused delay in asserting rights during a period of time in which adverse rights in the premises have been acquired under circumstances that make it unequitable to displace such adverse rights for the benefit of those who are bound by the delay.

3. It is incumbent upon a complainant to allege in his bill every fact, clearly and definitely, that is necessary to entitle him to relief; and if he omits essential facts therefrom, or states such facts therein as show that he is not entitled to relief in a court of equity, he must suffer the consequence of his so doing.

4. He who comes into equity to get rid of a legal title as a cloud upon his own must show clearly the validity of his own title, and the invalidity of his opponent's. Equity will not act in such cases in the event of a doubtful title. And a party to be relieved and to succeed in contests of this character must do so on the strength of his own title, and not on the weakness of his adversary's.

5. The law is well settled that where it is clearly apparent upon the face of the bill that complainants therein have slept so long upon their rights as to be guilty of laches in the assertion of them, such question of laches may be raised and determined upon a general demurrer for want of equity in the bill.

6. The application by the courts of the doctrine of laches depends upon the circumstances of each particular case.

7. There is a well-established rule affecting more directly the pleadings in a court of equity to the effect that where a bill upon the face of its allegations show long *acquiescence* and *laches* by the complainants in the assertion of their claims, then it becomes necessary for them, by way of excuse for such apparent *acquiescence* and laches, to *allege* and prove some actual hindrance or impediment to the seeking of their rights, such as concealment of, or faultless want of knowledge of facts, and if they fail to allege or prove such excuse or reason for the long delay, laches will be imputed to them, and the courts will refuse their aid by reason thereof.

8. No rule of law is better settled than that a court of equity will not aid a party whose application is destitute of conscience, good faith and reasonable diligence, but will discourage stale demands for the peace of society, by refusing to interfere where there have been gross laches in prosecuting rights, or where long acquiescence in the assertion of adverse rights has occurred.

9. One claiming under a conveyance to him merely "as trustee" without disclosing the beneficiaries or the nature or object of the trust he represents, cannot be regarded as having any rights superior to those who conveyed to him "as trustee."

10. Where complainant "as trustee" and certain of the defendants who claim a legal title through descent from Polly Lewis whose title to land was confirmed by the United States in 1825, had not asserted their rights till 1920, and others who claim adversely under a conveyance executed by Mary Lewis in 1832, have divided the land into city lots and blocks and have by executing conveyances, of and by giving or permitting liens on the land, dealt with the land and with the title thereto as owners thereof, and the delay from 1832 to 1920 is asserting their rights by those claiming through descent and their predecessors in interest, is not in any way explained or excused, such delay under the circumstances while adverse rights are being asserted through so long a period of time, is prejudicial to the rights of the adverse claimants, and constitutes laches that make it inequitable to annul the title of the adverse claimants.

An Appeal from the Circuit Court for Dade County; H. Pierre Branning, Judge.

Affirmed.

*Carson & Botts,* for Appellant;

*Shutts & Bowen, Atkinson & Burdine, Hudson, Wolfe & Cason, Uly O. Thompson, Price, Price & Small* and *Gramling & Clarkson,* for Appellees.

## STATEMENT.

The bill of complaint herein filed July 19, 1920, alleges that "Lewis G. Norton as trustee, brings this his second amended bill of complaint against R. A. Amsden" and many other named defendants, "Whereupon your orator complaining says:

"1. That on to-wit: March 3, 1823, by an act known as the donation act, the Congress of the United States confirmed to Polly Lewis and others, lands cultivated by them in the State of Florida; that on to-wit: December 23, 1825, a commission of the United States confirmed to Polly Lewis 640 acres under the donation act, on the east side of Miami River, near Key Biscauino; that the said land of Polly Lewis so confirmed aforesaid, was surveyed in the year 1845 by George McKay, Deputy Surveyor, under his contract with the Surveyor General of Florida; that as surveyed the land is described as follows, to-wit:

"Beginning at stake and stones ('on the Bay') for S. E. corner of donation claim of Mrs. Hagan and which is the N. E. corner of this survey. From said corner a Gumbo Limbo bears N. 28, W. 50 links and a crabwood bears S.

47, W. 60 links distant; thence along the coast of Atlantic ocean which is the eastern boundary of this survey; as follows: S. 8½, E. 20 chains; thence S. 35½, W. 4 chains; thence S. 57½, W. 31 chains; thence S. 66, W. 8.50 chains; thence S. 41, W. 2.20 chains; thence S. 15, W. 12.50 chains, to a stake and stones for the S. E. corner of this survey, and also N. E. corner of the claim of Jonathan Lewis; thence west along the south line of this survey, which is also north line of claim of Jonathan Lewis, 88 chains to the stake and stones for the S. W. corner to this survey and a corner to fractional section eleven. From said corner a pine bears S. 41, E. 55 links, a pine bears N. 60, E. 37 links and a pine bears N. 43, W. 86 links distant. Thence North along the western boundary of this survey 56.50 chains to 'a stake,' for N. W. corner of this survey and a corner to fraction section eleven. From said stake a pine bears N. 38, W. 10 links and a pine bears S. 40, E. 80 links distant. Thence East along north line of this survey 26 chains to the stake and stones for S. W. corner of claim of Mrs. Hagan. From said corner a pine bears N. 30, E. 75 links and a pine bears S. 45, W. 30 links distant, 126 chains to the N. E. corner of this survey and place of beginning, containing 634 17/100 acres.

"That said land had been, before February 22, 1819, inhabited and cultivated by said Polly Lewis.

"2. That on to-wit: March 21, 1896, a patent was granted by the United States to Polly Lewis, granting to her the following described land, to-wit:

"Beginning at the stake and stones (on the Bay) for the Southeast (S.E.) corner of the donation claim of Mrs. Hagan and which is the Northeast (N.E.) corner of this survey. From said corner a Gumbo Limbo bears North

(N.) 28, W. 50 lengths, and a crabwood bears S. 47, W. 60
lengths distant; thence along the coast of the Atlantic
ocean which is the eastern boundary of this survey, as
follows: South 8½, E. 20.00 chains; thence South 35½,
W. 4.00 chains; thence South 57½, W. 31.00 chains; thence
South 66, W. 8.50 chains; thence South 41, W. 2.20 chains;
thence South 15, W. 12.50 chains to a stake and stones for
the Southeast (S.E.) corner of this survey, also Northeast
(N.E.) corner of the claim of Jonathan Lewis; thence West
along the southern boundary of this survey, which is also
the northern boundary of the claim of Jonathan Lewis
88.00 chains to a stake and stones for Southwest (S.W.)
corner of this survey, and a corner to fractional Section
eleven (11), Township fifty-four (54) South, Range forty-
one (41) East. From said corner a pine bears South 41,
E. 55 links, a pine bears North 43, W. 86 links distant and
a pine bears North 60, E. 37 links distant; thence North
along the western boundary of this survey 56.50 chains to
a stake for the Northwest (N.W.) corner of this survey
and a corner to fractional Section eleven (11), Township
fifty-four (54) South, Range forty-one (41) East, from
said stake a pine bears North 38, W. 10 links and a pine
bears South 40, E. 80 links distant; thence East along the
northern boundary line of this survey 26.00 chains to the
stake and stones for the Southwest (S.W.) corner to the
claim of Mrs. Hagan; from said corner a pine bears North
30, E. 75 links; and a pine bears South 45, W. 30 links
distant 126.00 chains to the northeast corner of this sur-
vey and place of beginning, being Section thirty-nine
(39), Township fifty-four (54) South, Range forty-one
(41) East, to the Tallahassee Meridian, Florida, and con-
taining 637.23 acres, U. S. Surveyor General's Office,
Tallahassee, Florida, February 6, 1895, examined and
approved W. H. Milton, Jr., U. S. Surveyor General, copy

of which said plat is attached to this bill of complaint and made a part hereof; that on the date of the said patent the said Polly Lewis had been for a long time dead and that, therefore, the said patent was a nullity; but that the heirs of the said Polly Lewis were the owners of said land under and by virtue of the Act of Congress and its confirmation aforesaid.

"3.   That on to-wit: May 28, 1832, and prior thereto, and thereafter, the said Polly Lewis was married to Jonathan Lewis.

"4.   That neither prior to her marriage with the said Jonathan Lewis nor after her marital relations with the said Jonathan Lewis had ceased did she execute any conveyance of any kind to the said property nor did she and her husband, during their marital relations, jointly execute any conveyance to the said property nor have any of their successors in title conveyed any title except as is hereinafter set out.

"5.   That the said Jonathan Lewis and the said Polly Lewis died intestate; leaving four children, to-wit: George Lewis, Frank, sometimes referred to as Frankie Lewis; Frances Lewis and Elizabeth Catherine Lewis; that the said George Lewis died intestate; that the said Frank or Frankie Lewis never married and died intestate; that the said Frances Lewis married a man named W. A. Johnson, that both the said Frances Lewis Johnson and the said W. A. Johnson, her husband, died intestate; that the issue of their marriage consisted of five children, to-wit: W. A. Johnson, Jr.; Melinda Johnson; Caroline Johnson; Frances Johnson and Elizabeth Johnson; that the said Elizabeth Catherine Lewis married a man named Gould; that both the said Elizabeth Lewis Gould and her husband

died intestate; leaving four children, towit: William Gould, George Gould, Georgianna Gould, who married a man named Knowles, and James R. L. Gould.

"6. That the said W. A. Johnson, Jr., was married; that he and his wife died intestate, leaving six children, to-wit: Frances Johnson, Lizzie Johnson, Morning Johnson, Sidney Johnson, Winn Johnson, and Mollie Johnson; that the said Frances Johnson married a man named Granger; that Frances Johnson Granger and her husband both died intestate; leaving three children, to-wit: Bertha Granger, Floyd Granger, Anna Granger, all of whom are still living; that the said Lizzie Johnson married a man named Grantham; that both she and her husband died intestate, leaving one child, to-wit: May Grantham, who is still living; that the said Morning Johnson is married and is living with her husband, John L. Jones; that the said Sidney Johnson and the said Winn Johnson are living; that the said Mollie Johnson married Abe Waddell; that she died intestate, leaving her husband, Abe Waddell, still living, and three minor children, to-wit: Mollie J. Waddell, Folley Waddell and Edgar Waddell, all of whom are still living.

"6: That the said Melinda Johnson married Benjamin A. Baker; that she died intestate leaving her husband still living and eight children, to-wit: Stella Baker, who married Charles E. Roberts; William M. Baker; Benjamin A. Baker, Jr.; Oliver F. Baker; Lemuel Baker; Jessie V. Baker, who married Charles E. Duval; Carl Baker; and Pansy I. Baker, who married Hershel Connor, all of whom and their respective husbands are still living.

"8. That the said Caroline Johnson married William Cornish; that she died intestate, leaving her husband still living and four children, to-wit: George Cornish, Junetta

Cornish, who married Joseph Pinder; Hattie Cornish, who married Joseph Saunders; both of whom and their husbands are still living; and Ida Cornish, who married a man named Cook; that the said Ida Cornish Cook and her husband both died intestate, leaving five children, to-wit: Blondie Cook, a minor; Brunette Cook, a minor; Leo Cook, a minor; Camille Cook, who married Lena Cruz; and Florell Cook, who married Vernon Griffin; all of whom and their respective husbands are still living.

"9. That the said Frances Johnson married a man named Cornish; that her husband is dead but she is still living.

"10. That the said Elizabeth Johnson married John Sweeting; that she died intestate, leaving her husband still living, that her said husband, John Sweeting, remarried, and died intestate, leaving five children, to-wit: Theodore A. Sweeting; Ida Sweeting; who married J. W. Pinder; Louise Sweeting, who married Frank Grant; that the said Frank Grant is dead; and Annie Sweeting, who married George W. Albury.

"11. That the said William Gould died intestate, leaving a widow and one son, James Gould.

"12. That the said Georgianna Gould married a man named Knowles; that she survived her husband and died intestate, leaving one child, Lillian Knowles, who married Charles Sutton.

"13. That James R. L. Gould was married and died intestate, leaving his widow, Charlotte I. Gould, and three children, to-wit: Gertrude O. Lowe, who married Jackson Lowe; Ella I. Curry, who married Charles J. Curry; and Percival O. Gould.

"14. That Camille Cruz and Lena Cruz, her husband; Florell Griffin and Vernon Griffin, her husband; William Cornish; George Cornish and Lizzie Cornish, his wife; Hattie Saunders and Joseph Saunders, her husband, heretofore mentioned, have heretofore conveyed all of their interest in the said property to your orator, as trustee.

"15. That Jessie V. Duval and Charles E. Duval, her husband, heretofore mentioned, have heretofore conveyed all of their interest in the said property to your orator, as trustee.

"16. That Pansy I. Connor and Hershel M. Connor, her husband, heretofore mentioned, have heretofore conveyed all of their interest in the said property to your orator, as trustee.

"17. That Carl V. Baker and wife, Hattie Baker, heretofore mentioned, have heretofore conveyed all of their interest in the said property to your orator, as trustee.

"18. That Benjamin A. Baker, Sr., a widower; William Baker and wife, Nellie B. Baker; Lemuel A. Baker and wife, Mamie Baker; Benjamin A. Baker, Jr., and wife, Hattie Baker, heretofore mentioned, have heretofore conveyed all of their interest in the said property to your orator, as trustee.

"19. That Frances H. Cornish, a widow, heretofore mentioned, has heretofore conveyed all of her interest in the said property to your orator, as trustee.

"20. That Gertrude O. Lowe and husband, Jackson Lowe, heretofore mentioned, have conveyed all of their interest in the said property to your orator, as trustee. ·

"21. That James Gould, heretofore mentioned, has conveyed all of his interest in said property to your orator, as trustee.

"22. That the following aforesaid described persons own in fee simple that part of said property set opposite their names: ·

| | |
|---|---|
| Bertha Granger | 100/18000 |
| Floyd Granger | 100/18000 |
| Annie Granger | 100/18000 |
| May Grantham | 300/18000 |
| Morning J. Jones | 300/18000 |
| Sidney Johnson | 300/18000 |
| Winn Johnson | 300/18000 |
| Abe Waddell | 75/18000 |
| Mollie J. Waddell | 75/18000 |
| Folley Waddell | 75/18000 |
| Edgar Waddell | 75/18000 |
| Stella Roberts | 200/18000 |
| Oliver F. Baker | 200/18000 |
| Junetta C. Pinder | 360/18000 |
| Blondie Cook | 72/18000 |
| Brunette Cook | 72/18000 |
| Leo Cook | 72/18000 |
| Theodore A. Sweeting | 450/18000 |
| Ida Pinder | 450/18000 |
| Louise Grant | 450/18000 |
| Annie Albury | 450/18000 |
| Lillian Sutton | 3000/18000 |
| Ella I. Curry, subject to dower | 1000/18000 |
| Percival C. Gould, subject to dower | 1000/18000 |
| Complainant | 4424/18000 |
| Complainant, subject to dower | 4000/18000 |
| Mrs. William Gould, dower in | 3000/18000 |
| Charlotte I. Gould, dower in | 3000/18000 |

That the said aggregate interests of the said persons constitute the entire fee simple interests in said property; that the said persons are co-tenants in said property.

"23.   That the following (26) persons, firms and cor-
porations claim some lien against the portion of said prop-
erty set opposite their names, by reason of certain alleged
mortgages given by the persons, firms or corporations
whose names appear after the description of the portion
of said property against which the aforesaid parties claim
a lien: (particulars being stated.)     That said claims
against the said property as enumerated in this paragraph
and numbered from one to twenty-six inclusive, as hereto-
fore set out in this paragraph, are recorded in the office
of the clerk of the Circuit Court for Dade County, Florida,
and constitute clouds upon the title of your orator, and
tend to depreciate the value of said property to your
orator and to those heirs of Polly Lewis who have not con-
veyed their interest in said property to your orator, said
heirs having been made parties defendant hereto; that the
title of your orator and the aforementioned heirs of the
said Polly Lewis, who have been made defendants hereto,
ought to be clear, unincumbered and unimpaired, and
the said clouds constituted by said alleged mortgages ought
to be removed; that said alleged mortgages and the claim
of said persons claiming by, through and under said mort-
gages as hereinbefore set forth in this paragraph, are in-
ferior to the title of your orator and those heirs of Polly
Lewis who have been made parties defendant hereto, and
should be set aside, cancelled, and declared null and void
as against the claim of your orator and said heirs of Polly
Lewis who have been made defendants hereto, and by
decree of this honorable court should be ordered to be
delivered up to be cancelled.

"24.   That the following persons, firms and corpora-
tions claim some lien against the portion of said property
set opposite their names, by reason of certain alleged liens

given by the persons, firms or corporations whose names appear after the description of the portion of the property against which the aforesaid parties claim a lien.

"1.  P. B. Bechard, Lot 49, Block 2, Point View—Sarah McGuire.

"2.  Charles L. Craig, Lot 50, Block 2, Point View— L. R. Cunnnigham.

"3.  Charles L. Craig, Lot 38, Block B.—F. M. Bookwalter.

That said claims against the said property enumerated and numbered from one to three inclusive, as hereinbefore set out in this paragraph, are recorded in the office of the clerk of the Circuit Court for Dade County, Florida, and constitute a cloud upon the title of your orator and tend to depreciate the value of said property to your orator and to those heirs of Polly Lewis who have not conveyed their interest in said property to your orator, and who have been made parties defendant hereto; that the title of your orator and the aforesaid heirs of Polly Lewis, defendants hereto, ought to be clear, unincumbered and unimpaired, and that the said clouds constituted by the liens aforesaid, ought to be removed; that said alleged liens are inferior to the title of your orator and those heirs of Polly Lewis who have been made defendants hereto, and therefore should be set aside and declared null and void and be decreed by the order of this honorable court to be delivered up to be cancelled under the order of this honorable court.

"25.  That the following (105) persons, firms and corporations claim title to the portion of said property as described and set opposite their names, through an alleged deed from one Mary Lewis to one Richard Fitzpatrick, and by divers subsequent intermediate conveyances, said

alleged deed from Mary Lewis to said Richard Fitzpatrick covering all of the property hereinbefore described in this bill of complaint, and purporting to convey all of said property to said Richard Fitzpatrick, a copy of which said deed being attached to the original bill of complaint herein, and hereby by reference made a part hereof as completely as if fully set out herein; that the said portion of said property in this paragraph set out is wild, unimproved and unoccupied, and not in the actual possession of any person whomsoever, and that by virtue of the title of your orator, he is in constructive possession thereof: (names and lots and blocks being stated.)    That said claims against said property enumerated and numbered from 1 to 105 inclusive, as hereinbefore set out in this paragraph, are recorded in the office of the Clerk of the Circuit Court for Dade County, Florida, and constitute clouds upon the title of your orator and tend to depreciate the value of said property to your orator and to those heirs of Polly Lewis who have not conveyed their interest in said property to your orator and have been made parties defendant hereto; that the title of your orator ought to be clear, unincumbered and unimpaired and the aforesaid clouds upon said title ought to be removed; that said alleged deeds and title claimed by the persons heretofore mentioned in this paragraph to the property therein mentioned in connection with their names, are inferior in every respect to the title of your orator and to those heirs of Polly Lewis who have been made defendants hereto, and therefore should be set aside, cancelled, and declared null and void, and be decreed to be delivered up to be cancelled under the order of this honorable court; the said several deeds constituting the several chains of title from said Mary Lewis to the various persons hereinbefore mentioned in this paragraph, who claim title to the several pieces of property mentioned in

connection with their names, and which said deeds are so
numerous that it is impossible for your orator here to set
them forth, are null and void in so far as they attempt to
pass any title to the persons named in said schedule here-
inbefore set forth in this paragraph to any of the property
mentioned in said schedule in connection with their names,
for the reason that said Mary Lewis was not-at the time of
making said deed to said Richard Fitzpatrick, seized of any
title whatsoever in and to said property which was de-
scribed in said deed from said Mary Lewis to said Richard
Fitzpatrick, and which property is hereinbefore described
in this bill of complaint, but on the contrary the title in
and to all of the property described in this bill of com-
plaint was at the time of the making and delivery of said
deed from said Mary Lewis to Richard Fitzpatrick, and
has been at and during all the time from the date of said
deed from Mary Lewis to Richard Fitzpatrick to this date
and now is in said Polly Lewis and the several heirs of
Polly Lewis as hereinbefore in this bill of complaint de-
scribed, and now is in your orator and those heirs of Polly
Lewis who have been made defendants to this bill.

"26.  Your orator is informed and believes and upon
such information and belief alleges the facts to be that no
person or persons other than those mentioned and described
in this bill of complaint have or claim to have any interest
in or title to the said parcels of land described in para-
graphs numbered 23, 24 and 25, or any part thereof, in
possession, remainder, reversion or otherwise, except as
hereinbefore set forth in this bill of complaint.

"27.  That your orator is desirous that partition or
division of said land should be made of the said several
parcels of land hereinbefore described in paragraphs 23,
24 and 25, between your orator and the defendants, Bertha

Granger, Floyd Granger, Annie Granger, May Grantham, Morning J. Jones, Sidney Johnson, Winn Johnson, Abe Waddell, Mollie J. Waddell, Folley Waddell, Edgar Waddell, Stella Roberts, Oliver F. Baker, Junetta C. Pinder, Blondie Cook, Brunette Cook, Leo Cook, Theodore A. Sweeting, Ida Pinder, Louise Grant, Annie Albury, Lillian Sutton, Ella I. Curry, Percival C. Gould, Mrs. William Gould, Charlotte I. Gould, according to their respective rights, estates and interests therein, or in case same cannot be divided and partitioned without material injury to the interests of the several parties hereinbefore in this paragraph set forth, then that the said property may be sold and the proceeds divided among such parties according to their respective rights and interests therein.

"28. That the said land is very valuable and a number of the parties having interests in the said property, as heretofore set out, are minors; that many of the said persons live at distant places; that the interests of the respective parties are so intricate that the complainant is utterly unable to secure an amicable division of the property or a division of the proceeds of the sale of the said property, if the said property can be sold."

It is prayed:

"1. That a guardian *ad litem* be appointed by the court to represent the interests of the minor defendants, Blondie Cook, Brunette Cook and Leo Cook.

"2. That the said alleged mortgages mentioned in paragraph 23 of this bill of complaint and the said alleged liens mentioned in paragraph 24 of this bill of complaint, and all right, title and interest of the persons named in the schedule contained in paragraph 25 of this bill of complaint, respecting the several parcels and pieces of prop-

erty mentioned in said schedule in connection with the names of said various parties, be by the decree of this honorable court, declared to be inferior to the title of your orator and the several heirs of Polly Lewis made defend-- ant to this bill, and be declared to be clouds upon the title of your orator and the several heirs of Polly Lewis made defendants to this bill, and that said alleged mortgages, liens, deeds and any other claim to title by any of the persons mentioned in the schedules in paragraphs 23, 24 and 25 of this bill of complaint shall be declared to be null and void, and shall by decree of this honorable court be ordered to be delivered up and cancelled; that said persons mentioned in the schedules in paragraphs 23, 24 and 25 of this bill of complaint may be by decree of this honorable court enjoined from claiming any interest in or to any of the property mentioned in said schedules contained in paragraphs 23, 24 and 25 of this bill of complaint in connection with their names, or from creating any clouds or encumbrances upon said property therein mentioned in connection with their names; and that the title of your orator and said several heirs of Polly Lewis in and to the property described in the schedules in paragraphs 23, 24 and 25 of this bill of complaint shall be forever quieted.

"3. That a division and partition of said property shall be made between your orator and the several heirs of Polly Lewis who have been made defendants hereto, according to the course of practice in this court and the statute in such case made and provided, according to the respective rights, claims and interests of your orator and said heirs of Polly Lewis, and that in case it shall appear to the court that partition thereof cannot be made without manifest injury to the rights of the parties entitled thereto, then that said property may be, by decree of this court,

ordered sold or such parts as may to the court seem wise and expedient may be decreed to be sold, and the proceeds of said sale or sales, after paying the proper costs and charges of this suit, may be divided among the said parties according to their respective rights and interests therein as decreed by this court; that the several rights and interests of said parties in and to said property or the proceeds thereof may be ascertained and determined by this court.''

Attorney fees and general relief are also prayed.

The deed from Mary Lewis to Richard Fitzpatrick is as follows:

''KNOW ALL MEN by these presents that I, Mary Lewis of Monroe County in the Territory of Florida, residing at Cape Florida in said county, for and in consideration of the sum of Five Hundred Dollars lawful money of the United States, to me paid by Richard Fitzpatrick of the county aforesaid, the receipt whereof I do hereby acknowledge and am therewith satisfied, contented and paid have this day bargained and sold, and by these presents do bargain, sell, deliver, and convey onto the said Richard Fitzpatrick, all my right, title, and interest which I have in and to a tract or parcel of land, and all the improvements thereon, containing six hundred and forty acres, situate and being on Key Biscayne Bluff near Cape Florida between Jonathan Lewis land and land purchased by said Richard Fitzpatrick from Rebaca Eagan; and all claim which I or my heirs may hereafter have to said tract of land, and the improvements on it of every kind whatever, by virtue of a donation grant from the United States to me in the year 1825, certificate of which is on record at St. Augustine, I do hereby sell, deliver and transfer unto the said Richard Fitzpatrick, his heirs and assigns forever.

"Witness my hand and seal this twenty-eighth day of May, 1832.

MARY LEWIS        (Seal)

Signed, sealed and delivered in the presence of

LEMUEL OTIS,
O. H. PHILIPPE.        } (L. S.)

TERRITORY OF FLORIDA,

COUNTY OF MONROE.

This is to certify that on the ninth day of November, 1833, Lemuel Otis, one of the subscribing witnesses to the foregoing instrument of writing personally appeared before me, and being duly sworn, did say that the foregoing is the signature of Mary Lewis, executed in his presence for the purpose therein specified.

A. H. DAY   (L. S.)

Clerk M. C. C.

"I, George Hudson, Clerk of the Circuit Court in and for the County of Monroe, Sixth Judicial Circuit of Florida do hereby certify the foregoing to be a true and correct copy of deed of Mary Lewis to Richard Fitzpatrick as appears of record in Volume "B" Deeds, pages 42 and 43, Monroe County Records.

"In Testimony Whereof, I have hereunto set my hand and affixed the seal of said court at Key West, Florida, this twenty-third day of April, A. D. 1890.

GEO. HUDSON,

Clerk Circuit Court, Monroe County, Florida.
Rec. this 23d May, 1890, A. F. Q. C. C. C.

STATE OF FLORIDA,

COUNTY OF DADE.

I, Ben Shepard, Clerk of the Circuit Court in and for the aforesaid County and State, do hereby certify that the above and foregoing is a true and correct copy of the original as the same appears of record in Deed Book "D," at page 172 of the Public Records of Dade County, Florida.

"Witness my hand and official seal at Miami, this the 9th day of December, A. D. 1921.

BEN SHEPARD, Clerk,

By B. S. Peeler, D. C."

The court on demurrers decreed for the defendants adverse claimants, and on appeal the complainant argues his right as against the demurrers to maintain the suit as brought and that laches to bar the asserted title of the complainant and other alleged co-tenants who are made defendants, does not appear by the bill to make it subject to demurrers.

WHITFIELD, J., (*after stating the facts.*)

This suit was brought to cancel of record one chain of title to land and for partition of the land under another chain of title. Certain of the defendants and the complainant "as trustee" claim title through descent from Polly Lewis to whom a donation of land was confirmed by the United States in 1825. Other defendants, herein called adverse claimants, hold adversely under a deed of conveyance dated May 28th, 1832, from Mary Lewis to Richard Fitzpatrick in which deed the grantor conveyed all her claim to the land "by virtue of a donation grant from the

United States to me in the year 1825, certificate of which
is on record at St. Augustine.'' It does not appear that
there was any title of record other than that indicated by
the deed of conveyance executed to Richard Fitzpatrick
which referred to a donation grant of the land to the
grantor by the United States in 1825.

It is alleged in effect that at the time of making the
deed to Richard Fitzpatrick in 1832, Mary Lewis was not
seized of any title whatsoever in and to the described lands
that had been confirmed to Polly Lewis by virtue of Acts
of Congress; that on May 28, 1832, and prior thereto and
thereafter Polly Lewis was married to Jonathan Lewis;
and that neither Polly Lewis nor her successors in title
conveyed any title to the land except as to the portion
conveyed to the complainant ''as trustee.''

An appeal was taken by the complainant ''as trustee''
from orders sustaining demurrers of adverse claimant
defendants.

Among the points argued are the right of the complain-
ant ''as trustee'' to maintain the suit, multifariousness
and laches.

If it be conceded that the complainant ''as trustee'' may
maintain this suit without disclosing the beneficiaries or
the nature and object of the trust he represents, and if it
be also conceded that in one suit as against an appropriate
demurrer there may properly be an adjudication of the
title and liens claimed under a chain of title alleged to be
wholly distinct from and adverse to the now asserted title
of the parties alleged to be co-tenants under title derived
by the laws of descent from Polly Lewis, and to enjoin
the assertion of claims adverse to the co-tenants, and also
to adjudicate partition rights among the alleged co-tenants,

and even if it be conceded that the principles that afford equity jurisdiction to avoid a multiplicity of suits, may be invoked in a case of this nature, yet the very great lapse of time and the failure to assert rights under the alleged title by descent as against those claiming adversely under an alleged independent title, considered with the attendant facts alleged in the bill of complaint showing adverse dealings with the land and with the title thereto, under claim of right during a period extending over more than 75 years, make it clearly to appear that it would be inequitable to now disturb the rights of those claiming adversely to the alleged co-tenants. Laches may bar a suit to remove cloud from title. 5 R. C. L. 668. Laches is an unexcused delay in asserting rights during a period of time in which adverse rights in the premises have been acquired under circumstances that make it unequitable to displace such adverse rights for the benefit of those who are bound by the delay. The very great delay in this case is not excused, and it operated to prejudice the rights of others who cannot now be put in *statu quo.*

It is incumbent upon a complainant to allege in his bill every fact, clearly and definitely, that is necessary to entitle him to relief; and if he omits essential facts therefrom, or states such facts therein as show that he is not entitled to relief in a court of equity, he must suffer the consequences of his so doing. Durham v. Edwards, 50 Fla. 495, 38 South. Rep. 926.

He who comes into equity to get rid of a legal title as a cloud upon his own must show clearly the validity of his own title, and the invalidity of his opponent's. Equity will not act in such cases in the event of a doubtful title. And a party to be relieved and to succeed in contests of this character must do so on the strength of his own title,

and not on the weakness of his adversary's.  Levy v. Ladd, 35 Fla. 391, 17 South. Rep. 635; Houston v. McKinney, 54 Fla. 600, 45 South. Rep. 480; Jarrell v. McRainey, 65 Fla. 141, 61 South. Rep. 240; Hill v. DaCosta, 65 Fla. 371, 61 South. Rep. 750; Gasque v. Ball, 65 Fla. 383, 62 South. Rep. 215; Morgan v. Dunwoody, 66 Fla. 522, 63 South. Rep. 905; Stewart v. Stewart, 19 Fla. 846.  It must be assumed that the complainant has stated his case as strongly and as fully as the facts will warrant or justify.

The law is well settled that where it is clearly apparent upon the face of the bill that complainants therein have slept so long upon their rights as to be guilty of laches in the assertion of them, such question of laches may be raised and determined upon a general demurrer for want of equity in the bill.  King v. Dekle, 53 Fla. 940, text 941, 43 South. Rep. 586; Murrell v. Peterson, 57 Fla. 480, 49 South. Rep. 31; Hays v. Seattle, 251 U. S. 233, 40 Sup. Ct. Rep. 125.

Laches is a neglect to do something that, by law, a man is obligated or in duty bound to do.  The application by the courts of the doctrine of laches depends upon the circumstances of each particular case.  Anderson v. Northrop, 30 Fla. 612, text 615, 12 South. Rep. 318.  See also 18 Standard Ency. Proc. 430; Words and Phrases, Laches; 12 Ency. Pl. & Pr. 829.

"There is a well-established rule affecting more directly the pleadings in a court of equity to the effect that where a bill upon the face of its allegations shows long *acquiescence* and *laches* by the complainants in the assertion of their claims, then it becomes necessary for them, by way of excuse for such *apparent acquiescence* and laches, to *allege* and prove some actual hindrance or impediment to the seeking of their rights, such as concealment of, or fault-

less want of knowledge of facts, and if they fail to allege or prove such excuse or reason for the long delay, laches will be imputed to them, and the courts will refuse their aid by reason thereof. Badger v. Badger, 2 Wall. 87, and if the bill shows such laches on its face without any allegations excusing it, the defect can be taken advantage of by demurrer. Bercy v. Lavretta, 63 Ala. 374; Maxwell v. Kenedy, 8 How. 210.'' Anderson v. Northrop, *supra;* Johnson v. McKinnon, 45 Fla. 388, 34 South. Rep. 272; Moseley v. Taylor, 68 Fla. 294, 67 South. Rep. 95; 16 Cyc. 267. See also Hagan v. Ellis, 39 Fla. 463, 22 South. Rep. 727, 63 Am. St. Rep. 167; Coram v. Palmer, 63 Fla. 116, 58 South. Rep. 721; 5 R. C. L. 668; 9 C. J. 1200; Mayse v. Gaddis, 2 App. Cas. (D. C.) 20; Ryason v. Dunten, 164 Ind. 85, 73 N. E. Rep. 74; Chase v. Chase, 20 R. I. 202, 37 Atl. Rep. 804; Peck v. Haley, 21 App. Cas. (D. C.) 224; Maxwell v. Kennedy, 8 How. (U. S.) 210.

The complainant, ''Lewis G. Norton, as trustee,'' does not appear to have any better right or title than his grantors had as heirs, and any circumstances that operate as laches or otherwise to make the enforcement of their claim inequitable, would likewise in equity bar his claim of title as a grantee trustee from them, he not appearing to be a *bona fide* purchaser for value without notice of circumstances that may affect the claims of his grantors. *Non constat* he is a mere trustee for voluntary beneficiaries named by his grantors, the allegations being merely that certain alleged co-tenants ''have heretofore conveyed all of their interest in the said property to your orator, as trustee.''

The act of 1915 as amended in 1919, now Section 3793 Revised General Statutes, 1920, relates to the title a grantee as trustee *may* receive and convey.

The complainant "as trustee" alleges that he and certain named defendants have title to the lands as co-tenants, derived from Polly Lewis who received title from the United States and died intestate without conveying the title to any one.

It is alleged that certain named (105) parties defendant "claim title" to stated portions of the land "through an alleged deed from one Mary Lewis to one Richard Fitzpatrick, and by divers subsequent intermediate conveyances." The deed from Mary Lewis to Richard Fitzpatrick is dated May 28th, 1832, and presumably was duly recorded, as its execution was proved before the Clerk of the Circuit Court for Monroe County, November 9th, 1833, in which county the land then was; and it is alleged that "divers subsequent intermediate conveyances" were made which resulted in the title claimed by stated defendants. A certified copy of the deed shows it was of record in Monroe County, Florida, on April 23rd, 1890. This suit was begun in 1920.

It appears from the bill of complaint that the land is subdivided into lots and blocks, stated at the bar to be in the City of Miami, and the bill alleges that mortgages and liens upon some of the lots are recorded. It is fair to assume from the facts alleged that the conveyances through which the adverse defendants claim title and liens upon the property have been duly recorded from time to time since the execution in 1832 of the deed of conveyance from Mary Lewis to Richard Fitzpatrick, the alleged source of the adverse defendants' claims, which, extending over a period of over seventy years, taken with the sub-division of the land by adverse parties into lots and blocks, shows great laches on the part of the alleged co-tenants and their predecessors in claim, in failing to assert a title if they had

one during such a long period of time; and no explanation or excuse for such delay and inaction is shown, and none can be inferred from the allegations of the bill. In Price v. Horton, 79 Fla. 97, 83 South. Rep. 670, the delay was not so long and was explained, the plaintiff being a non-resident of the State.

It is alleged that stated portions of the property "is wild, unimproved and unoccupied and not in the actual possession of any person whomsoever." But this allegation is not controlling when considered with the facts that the land is described as being lots and blocks in a city, that title thereto was acquired through divers intermediate conveyances from the alleged original conveyance from Mary Lewis to Richard Fitzpatrick in 1832, that liens have been acquired and recorded on some of the lots, and that the alleged title of the co-tenants was not asserted until 1920, and no explanation of or excuse for such in action appears, since laches of the alleged co-tenants renders it inequitable to cancel the title of adverse claimants, even if the land consisting of city lots and blocks, may be regarded as being "wild, unimproved and unoccupied, and not in the actual possession of" any one. The disclosed dealings with the title of the property and with the property itself and the great lapse of time are sufficient to show laches that make it inequitable to cancel the title of the adverse claimants, even in view of the allegation "that said Mary Lewis was not at the time of making said deed to said Richard Fitzpatrick, seized of any title whatsoever in and to said property." She may have been authorized to make the conveyance for the owners. Time obscures the facts.

The allegation that Polly Lewis did not convey the land to any one, does not cover all the avenues by which under

the law she and her heirs may have lost title to the property, *e. g.* it may have been sold for nonpayment of taxes or for partition, or other processes may have operated to extinguish the title of Polly Lewis.

In view of the disclosed dealings by adverse parties with the title to the lands and with the lands themselves, beginning in 1832 with a conveyance of the lands by a party asserted to be adverse to the alleged co-tenants, and of the failure of the co-tenants to assert their claim till 1920, it may be presumed that the title of the ancestor of the alleged co-tenants was extinguished by conveyance or otherwise, since only upon such an assumption can the dealings with the title and with the lands by those claiming adversely to the alleged co-tenants and the many years of apparent silence of acquiescence of the alleged co-tenants and their predecessors, and of their failure to assert their claim or to excuse the failure to do so, be reconciled with the ordinary course of human conduct with reference to interests in lands. See Fletcher v. Fuller, 120 U. S. 534, 7 Sup. Ct. Rep. 667. The long delay of the heirs of Polly Lewis in asserting title to the land was necessarily prejudicial to the adverse claimants, and shows gross laches that makes their prayer inequitable. See Pomeroy's Eq. Jur. (4th ed.) p. 3417 *et seq.;* Lansdale v. Smith, 106 U. S. 391; 5 Pomeroy's Eq. Sec. 21; Hanner v. Moulton, 138 U. S. 486, 11 Sup. Ct. Rep. 408; Richards v. Mackall, 124 U. S. 183, 8 Sup. Ct. Rep. 437; Spiedel v. Henrici, 120 U. S. 377, 7 Sup. Ct. Rep. 610.

There is nothing to indicate that the alleged co-tenants and their ancestors did not know that others were, during a period of many years, dealing with the land and with the title thereto in a manner that indicated a claim of ownership. Many of the co-tenants are alleged to be residents

of counties in the vicinity of the lands, and it does not appear that their ancestors were not residents of the section of the State where the land is, with ample facilities to know that others were dealing with the land as owners thereof. The fact that many of their heirs were and are married women and infants does not operate to prevent a loss of rights by estoppel *in pais* or laches, particularly in view of the great length of time that has elapsed and the circumstances shown as to the location and subdivision of the land and the dealings therewith by adverse claimants.

The heirs of Polly Lewis extend through several generations; and while many of them were at different times married women and infants, all of them were not; and the infants became of age at different times, except those who are now infants. Laches may affect the property rights of married women, particularly when they have a right of action to assert their title to or rights in property both real and personal. See 10 R. C. L. p. 403, Sec. 150; Secs. 2563, 2937 and 3951, Rev. Gen. Stats. 1920. Infants may sue by next friends. Sec. 2562, Rev. Gen. Stats, 1920.

Courts of equity view with disfavor suits brought long after the transaction in issue has occurred, and long after death has closed the lips of those familiar with the occurrence remote in point of time.

No rule of law is better settled than that a court of equity will not aid a party whose application is destitute of conscience, good faith and reasonable diligence, but will discourage stale demands for the peace of society, by refusing to interfere where there have been gross laches in prosecuting rights, or where long acquiescence in the assertion of adverse rights has occurred. Geter v. Simmons,

57 Fla. 423, 49 South. Rep. 131; Baldwin v. Christopher, 75 Fla. 605, 79 South. Rep. 339.

All those who would know the facts relating to Polly Lewis' dealing with the land or with the title thereto are doubtless long since deceased. The fact may be that Polly Lewis extinguished her rights or permitted them to be extinguished by some lawful means before her death, or that her heirs did so. After the lapse of nearly a hundred years, during which time others have acquired and repeatedly exercised rights with reference to the land under claim of ownership through a record conveyance executed by one Mary Lewis, during all of which time the heirs of Polly Lewis apparently asserted no title and presumably paid no taxes, it is now manifestly inequitable to cancel the record title of adverse claimants as a cloud upon a title of the alleged co-tenants as heirs of Polly Lewis, which latter title, if it has not been otherwise extinguished, has been so long neglected while other rights in the lands have been acquired and exercised, that it would be unjust to now annul the title adversely claimed and long acted on under greatly changed conditions as to the uses of the land that must be greatly enhanced in value.

There is no allegation that the complainant or any of the alleged co-tenants or their ancestors who were heirs of Polly Lewis, ever exercised any right of ownership over the lands or paid any taxes thereon. The facts alleged justify an inference that the heirs of Polly Lewis recognized at least a presumption that the title of Polly Lewis had been extinguished by some means permitted by the law; and by silence and inaction for more than three-quarters of a century acquiesced in the rights of others who were during that long period of time dealing with the title to the land if not with the land itself as owners thereof.

There is no allegation that the heirs of Polly Lewis did not know of their rights in the land if their ancestor's title had not been extinguished or that the title to the land and the land itself was being dealt with by adverse parties as owners thereof. The facts alleged appear to indicate that they reasonably must have been aware of the claims and activities of adverse parties with reference to the land. The development and improvement of lands in that locality has been a matter of general knowledge for more than twenty years. Certainly the record of conveyances and liens, the subdivision of the land into city lots and blocks, and other facts and circumstances were sufficient to put the heirs upon enquiry, particularly when they were required to pay taxes on the land if they owned it. See Byrne Realty Co. v. South Florida Farms Co., 81 Fla. 805, 89 South. Rep. 318. No explanation of or excuse for the long delay is shown by the bill. The complainant asks for affirmative equitable relief when gross laches appear from his allegations.

There are allegations that "the title in and to all of the property described in this bill of complaint was at the time of the making and delivery of said deed from said Mary Lewis to Richard Fitzpatrick, and has been at and during all the time from the date of said deed from Mary Lewis to Richard Fitzpatrick to this date and now is in said Polly Lewis and the several heirs of Polly Lewis as hereinbefore in this bill of complaint described, and now is in your orator and those heirs of Polly Lewis who have been made defendants to this bill."

If these allegations may be regarded as being other than legal conclusions, they are not effective in equity to show a present title as against the rights of adverse defendants whose rights have priority because of gross laches of the

alleged co-tenants, making it inequitable that the alleged co-tenants should displace the rights acquired under circumstances and during a long period of time when good faith required of the alleged co-tenants or their ancestors a more prompt assertion of title if they had one.

The proper names ''Polly'' and ''Mary'' are sometimes used as synonyms (See Webster's International Dictionary; Funk & Wagnall's New Standard Dictionary, or as equivalents, 21 Am. & Eng. Ency. Law (2d Ed.) p. 309) ; Poll and Polly as familiar forms of Mary, Century Dict., pages 4597-8; and it may be that Polly Lewis, the grantee of the land and Mary Lewis, a subsequent grantor thereof were one and the same person. See Sowle v. Sowle, 10 Pick. (Mass.) 376; Commonwealth v. Berry, 114 Mass. 263; See also, State'v. Watson, 30 Kan. 281, text 288, 1 Pac. Rep. 770. See Fallon v. Kehoe, 38 Cal. 44, 99 Am. Dec. 347, as to effect of conveyance. The allegations of the bill do not negative this as an element in this case.

If Polly Lewis and Mary Lewis were the same person and if the conveyance of the land by Mary Lewis to Richard Fitzpatrick in 1832 was defectively executed, because she was then a married woman, or for other reasons, yet rights thereunder were apparently recognized or acquiesced in by the heirs of Polly Lewis for very many years during which time the lands were subdivided and scores of persons acquired rights therein on the faith of the Mary Lewis conveyance to Richard Fitzpatrick. The complainant does not appear to have any better rights than the heirs of Polly Lewis had; and those rights, if not otherwise extinguished, have been lost by gross laches.

The bill of complaint alleges that on ''December 23, 1825, a commission of the United States confirmed to Polly

Lewis 640 acres under the donation act, on the East side
cf Miami River, near Key Biscaneno.'' The land in con-
troversy is within that confirmed donation of land to Polly
Lewis.

By ''Treaty of Amity, Settlement and Limits between
the United States of America and His Catholic Majesty,
the King of Spain, concluded February 22, 1819, ratifica-
tions exchanged at Washington, D. C., U. S. A. February
22, 1821, proclaimed February 22, 1821,'' it is provided
that ''His Catholic Majesty cedes to the United States, in
full property and sovereignty, all the territories which
belong to him, situated to the eastward of the Mississippi,
known by the name of East and West Florida. The
adjacent islands depend on said provinces, all public
edifices, fortifications, barracks and other buildings, which
are not private property, archives and documents, which
relate directly to the property and sovereignty of said
provinces, are included in this article. The said archives
and documents shall be left in possession of the commis-
saries or officers of the United States, duly authorized to
receive them,'' and that ''all the grants of land made be-
fore the 24th of January, 1818, by His Catholic Majesty,
or by his lawful authorities, in the said territories ceded
by His Majesty to the United States, shall be ratified and
confirmed to the persons in possession of the lands, to the
same extent that the same grants would be valid if the
territories had remained under the dominion of His Cath-
olic Majesty. But the owners in possession of such lands,
who, by reason of the recent circumstances of the Spanish
nation, and the revolutions in Europe, have been prevented
from fulfilling all the conditions of their grants, shall com-
plete them within the terms limited in the same, respec-
tively, from the date of this treaty in default of which the
said grants shall be null and void. All grants made since

the said 24th of January, 1818, when the first proposal, on the part of His Catholic Majesty, for the cession of the Floridas was made, are hereby declared and agreed to be null and void.'' Articles 2 and 8 of treaty as shown by Fuller's Purchase of Florida, 1776-1819; State *ex rel.* Ellis v. Gerbing, 56 Fla. 603, 47 South. Rep. 353; 1 Rev. Gen. Stats, of Fla. 1920, 236.

Subsequent to the Treaty of February 22, 1819, by which Spain ceded to the United States the Territories known as East and West Florida, various Acts of Congress were passed for settling private land claims in the ceded territories, pursuant to the above quoted provision of Article 8 of the Treaty providing that ''all grants of land made before the 24th of January, 1818, * * * in said territories * * * shall be ratified and confirmed to the persons in possession of the lands to the same extent that the same grants would be valid if the territories had remained under the dominion of'' Spain. The titles to the land were to be ''ratified and confirmed to the persons in possession of the lands.'' Commissioners were appointed under Acts of Congress to examine and report upon claims made pursuant to the treaty of cession.

By Act of Congress, February 8th, 1827, titles to lands reported by the Commissioners for action were confirmed, and provision was made in the Act of Congress for a survey of the lands and for the issuance of patents to the claimants for the lands confirmed to them. Brickell v. Trammell, 77 Fla. 544, text 564, 82 South. Rep. 221.

By an Act of Congress approved March 30, 1822, it was enacted ''that all the territory ceded by Spain to the United States, known by the name of East and West Florida, shall constitute a territory of the United States,

under the name of the Territory of Florida.'' See 1 Rev. Gen. Stats. 1920, 247.

In 1823 the County of Monroe was formed at the southern end of the then Territory of Florida, extending North on the Eastern or Atlantic side of the peninsula above the Northern line of the present county of Dade. See Territorial Laws of Florida, approved July 3, 1823. The *locus in quo* is now situated in Dade County which was established in 1836. See Territorial Laws of Florida, approved February 4, 1836.

''The American State Papers, Volume 4, is a publication made under the authority of the Senate of the United States and contains documents, legislative and executive, of the Congress of the United States in relation to public lands. This volume contains the reports of the commissioners appointed under the Act approved in 1822, entitled An Act for ascertaining claims and titles to land within the territory of Florida. These documents are received in evidence without other proof of their authenticity than the published volume. See Sullivan v. Richardson, 33 Fla. 1, 14 South. Rep. 692. See Thiesen v. Gulf, F. & A. R. Co., 75 Fla. 28, text 68, 78 South. Rep. 491.

Volume 4, ''American State Papers'' page 273, under date November 24, 1824, giving the proceedings of the United States Commissioners, shows: ''Polly Lewis presented her memorial to this board, praying confirmation of title to 640 acres of land situated about one mile south of the river Miami, near Cape Florida. Filed.''

On page 274 of same volume under date December 15, 1824, this entry appears: ''Mary Lewis, by her attorney, Waters Smith, presented her memorial to this board, praying confirmation of title to 640 acres of land under the

donation act, situated on the river Miami, near Cape Florida. Filed.''

On page 277 *et seq.* of the same volume under date of January 31, 1826, the ''commissioners for ascertaining claims and titles to lands in East Florida.'' Under an Act of Congress reported to the Secretary of the Treasury among other matters that, ''in the discharge of the duties assigned them, they have examined and disposed of the claims herein set forth, in the manner and upon the principles exhibited in the following nine classes, numerically arranged.'' * * * ''Number four comprehends claims under the donation act of May, 1824, and not exceeding 640 acres, and which have been confirmed by the board upon satisfactory proof that the claimant was twenty-one years of age, and the head of a family, and that he had never received any written evidence of title from either the British or Spanish Government of East Florida; that furthermore, that he was actually settled on, and cultivating the land at and previous to the 22d February, 1819, according to the requirements of said act.'' * * * page 284. ''Report No. 4. *Register of claims to land not exceeding 640 acres founded on actual inhabitation and cultivation previous to the 22d of February, 1819, for which certificates of confirmation have been granted by the undersigned Commissioners.*'' * * * 5. Tolly Lewis. Acres 640. South of river Miami. Occupation and cultivation. From 1819 to 1825,'' dated ''St. Augustine, December 31, 1825.''

On page 301 of the same volume it appears that on December 23, 1825, the commissioners confirmed to ''Polly Lewis six hundred and forty acres under the donation act, on the east side of Miami river, near Key Biscaino.'' A particular description of the land as officially surveyed in

1845 appears in the bill of complaint copied into the statement filed herewith.

Whether or not the "memorial of title to 640 acres of land," etc., of "Polly Lewis," presented for confirmation on November 24, 1824, is the same as that presented for "Mary Lewis, by her attorney" on December 15, 1824, only one confirmation appears, and that is 640 acres to "Polly Lewis." The descriptions of land in the "memorials" and in the confirmation order and report are not definite. The index to volume 4 opposite the name "Lewis, Polly," refers to pages 273, 274, 284, 301. On page 274 the memorial entry relates to "Mary Lewis" and no reference is made to Polly Lewis on that page. The confirmation shown on page 284 is to "Tolly Lewis." Whether all these entries relate to one donation grant that was confirmed to Polly Lewis, need not now be discussed.

The deed of conveyance dated May 28, 1832, from Mary Lewis to Richard Fitzpatrick, states:

"KNOW ALL MEN by these presents that I, Mary Lewis of Monroe County in the Territory of Florida, residing at Cape Florida in said County, for and in consideration of the sum of Five Hundred Dollars lawful money of the United States, to me paid by Richard Fitzpatrick of the County aforesaid, the receipt whereof I do hereby acknowledge and am therewith satisfied, contented and paid have this day bargained and sold, and by these presents do bargain, sell, deliver, and convey unto the said Richard Fitzpatrick, all my right, title, and interest which I have in and to a tract of parcel of land, and all the improvements thereon, containing six hundred and forty acres, situate and being on Key Biscayne Bluff near Cape Florida between Jonathan Lewis land and land purchased by said Richard Fitzpatrick from Rebeca Eagan; and all

claim which I or my heirs may hereafter have to said tract of land, and the improvements on it of every kind whatever, by virtue of a donation grant from the United States to me in the year 1825, certificate of which is on record at St. Augustine, I do hereby sell, deliver and transfer unto the said Richard Fitzpatrick, his heirs and assigns forever.''

The reference in the deed of conveyance to the confirmed donation and to its location with reference to other similar confirmed donations, indicates that the grantor must have had some relation to the donation title that covers the granted lands.

The conveyance of the land by Mary Lewis to Richard Fitzpatrick in 1832, may have been regarded by the children of Polly Lewis, now all deceased, as an extinguishment of her and their rights in the land, thus explaining why no interest therein was asserted from 1832 to 1920.

If the title of Polly Lewis has not otherwise been extinguished it cannot now equitably be asserted in view of the gross laches of the heirs of Polly Lewis, while others, who through many years acquired and asserted rights in the land, have been prejudiced by such gross laches; and the complainant shows no rights that are better than those of the heirs of Polly Lewis.

Questions as to necessary parties and other matters need not be discussed.

Affirmed.

Browne, C. J., and Taylor and West, J. J., concur.

Ellis, J., not having heard argument took no part in decision.