MAKAR, J.
Who owns -the family homestead is the question in this internecine quarrel among six adult siblings whose father, lawyer John Morris,' Jr., and mother transferred sizable property holdings contemporaneously with the creation of a family trust agreement in the early 1980s. Three decades later, a spat over ownership of the property resulted in the trial court concluding,. under, the authority of section 689.07(1), Florida Statutes (2004), that two of the siblings, named on the property’s deeds as co-trustees and listed as beneficiaries in the trust agreement, owned the property outright in fee simple rather than as trustees for the benefit of all siblings. Because the trial court misapplied the statute and reached the wrong conclusion, we reverse.
I.
The Morris Grove Plantation is a sprawling 1,360-acre estate of harvestable timber, farmlands, and wetlands that spans two Florida counties just south of the Georgia border: 1,200 acres are in Jefferson .County with the remainder in neighboring Madison County. The northwesterly portion, across which a county road traverses, includes a domestic commissary for lodging, a buggy house,' a smokehouse and corn crib, .and . a family cemetery. The Plantation has been in the Morris family for over one - hundred years — it is where ancestral memories were made at family reunions, vacations, and other visits during which fishing, hunting, hiking, and even a wedding were highlights.
■In December 1983, the six Morris siblings entered into the Morris Grove Plantation Trust. Agreement, which designated two of the four brothers, John E. Morris III and Robert J. Moms, as co-trustees. All - of the siblings — John, Robert, Constance “Connie” Heiskell, Hugh Morris, Thomas Morris, and Lorraine Morris II— were named beneficiaries of the trust, each signing the Trust Agreement. Around the same time, their parents conveyed, the Morris Grove Plantation to John and Rob *717 ert. The transfers were accomplished via the staggered issuance of three warranty deeds to “John E. Morris, III and Robert J. Morris, as Trustees.” A letter from them father dated November 1983 expressed his intent that the Morris Grove Plantation be transferred in this manner and held in either a trust or a partnership for his children. (he was “inclined to a simple trust”). Though the record is thin, it appears the property has been used exclusively and continuously for family and commercial purposes, the latter involving primarily timber foresting.
Thirty years later, simmering disagreements between the Morris siblings, over the property’s future — a topic on which they are evenly divided — led to this litigation, pitting the. two trustee-brothers against one another, each with their own views of the application, of sections 689,07(1) and (4), Florida Statutes, the full text of which we provide later in our analysis. ....
On May 16, 2013,. John filed a single count complaint against his brother Robert to partition the Morris Grove Plantation, seeking the appointment of a special magistrate to sell the property with the “net proceeds [to be] divided equally between [John] and [Robert].” The complaint. alleged the property was indivisible and that the two brothers owned the property, .each having a. 50% interest. It also alleged, important .for this litigation, the following:
■While title was conveyed to Plaintiff and Defendant “as Trustees,”, pursuant to Florida Statute § 689.07, such conveyance grants fee simple estate interest to Plaintiff and Defendant since the warranty deed does not name any beneficiaries, does not state the nature and purposes .of. any trust, does not identify any trust by title or date and does not provide for - any contrary intention within the four corners of the warranty deed.
Though Robert would; personally benefit from the relief that John, sought, he was not enamored by .his brother’s legal maneuver. He moved to dismiss the case on the basis that the property was held in trust for all siblings and not subject to a partition action. Also citing section 689.07, he pointed out that the Trust Agreement had been recorded on June 11, 2013, which was sufficient to identify the trust and preclude the relief that John sought, even though the deeds had been recorded almost thirty years earlier.
John responded with a motion for partial summary judgment, arguing that the deeds granted fee simple ownership to Robert- and himself. He claimed that re-cordation of-the Trust Agreement was untimely as well as unauthorized.[1] As for section 689.07, he relied on subsection (1),. *718 which “makes clear that a trust document must be recorded prior to or at the same time as the deeds, in order to establish ownership by the trust.”
Robert argued that subsection (1) was inapplicable because subsection (4) permitted recordation of the Trust Agreement before or after recordation of the deed. He noted that the purpose of subsection (1) was to prevent fraud against innocent third parties who purchase trust property, a category that would not include trustees. Robert also pointed out that the brothers treated the property as belonging to the trust for three decades thereby estopping John’s legal tack. Robert’s affidavit said he and John operated the trust as such, including:
property maintenance, sale of timber, reforestation, payment of real estate taxes, payment of all other taxes both state and Federal, payment of employees whether part time or full time or contract labor, protecting the property ' from third parties and in particular, trespassers, payment of all expenses related to said real property and in general, all aspects concerned with the' management of real property.
Further, in January 1990,-“the parties to the trust formed a corporation with the name of Morris Grove Plantation, Inc. for the purpose of carrying out the financial duties of the trust” with a corporate board consisting of the six siblings. The corporation “received funds from the trust properties and paid trust bills.” Additionally, the trustees and beneficiaries acknowledged that the property was owned in a trust by attending meetings, working on the property, and making agreements to the operation of the trust over the last thirty years. ’
After a hearing, the trial judge initially denied John’s motion, but a few days later issued a corrected order granting his motion for partial summary judgment, stating its previous order was inadvertently entered. The new order ruled that John and Robert held the property in fee simple absolute because (a)'the Trust Agreement was not of record at the time of the deeds’ recordation, (b) the deeds contained no names of any beneficiaries or language stating the nature and purpose of the trust, and (c) nothing in the deeds expressed an intention that the grantees-trustees receive anything other than a fee simple estate. In response, Robert sought rehearing and countersued for deed reformation, the creation of a constructive or resulting trust, and injunctive relief. The trial court denied rehearing and dismissed his counterclaims; it also entered an order appointing the clerk to sell the property. This appeal ensued.[2]
II.
Whether the trial court correctly held that the deeds and conveyances of the Morris Grove Plantation to siblings, John and Robert, granted them the right to sell the property and share the proceeds between themselves, despite the existence of the Trust Agreement, hinges on how section 689.07 and its history are interpreted. Two competing views of the statute are in play. John focuses almost exclusively on subsection (1), saying it supports the trial court’s ruling that he personally has a 50% fee simple interest with no obligations to the trust or beneficiaries. Contrarily, *719 Robert says subsection (1) cannot be considered in isolation; subsection (4) — which relates to the recordation of trust agreements and their enforcement — must also be considered, else a manifestly unreasonable construction would result whereby trustees could misappropriate trust property for their own use rather than that of trust beneficiaries. We conclude that Robert has the far better view of the statute and its function.
One hundred years ago, the Florida Legislature first passed a law to “Prescribe the Effect and Meaning of the Word Trustee and the Words as Trustees When Added to the Name of the Grantee in Any Deed or Conveyance of Real Estate.” Ch. 6925, Laws of Fla. (1915). The language of that law, which has remained essentially the same since its enactment, is set forth in section 689.07(1), Florida Statutes:
(1) Every deed or conveyance of real estate heretofore or hereafter made or executed in which the words “trustee” or “as trustee” are added to the name of the grantee, and in which no beneficiaries are named, the nature and purposes of the trust, if any, are not 'set forth, and the trust is not identified by title or date, shall grant and is hereby declared to have granted a fee simple estate with full power and authority in and to the grantee in such deed to sell, cowtíey, and grant and encumber both the legal and beneficial interest in the real estate conveyed, unless a contrary intention shall appear in the deed or conveyance; provided, that there shall not appear of record among the public records of the county in which the real property is situate at the time of recording of such deed or conveyance, a declaration of trust by the grantee so described declaring the purposes of such trust, if any, declaring that the real estate is held other than for the benefit of the grantee.
(Emphases added). Generally speaking, if the only hint in a deed that the underlying property might be held in trust is the addition of the words “trustee” or “as trustee” to the grantee’s • name, the deed is deemed to have granted a fee simple estate to the 'grantee. Absent something more, such as named beneficiaries, or a trust’s name or purpose appearing in the deed, or the filing of a trust agreement prior to recordation of the-deed, the grantee has “full power and 'authority- ... to sell, convey, and grant and encumber both the legal and beneficial interest in the real estate conveyed, unless a contrary intention shall appear in the deed or conveyance[.]” Id. As long as none of the specified conditions are present, the grantee is authorized to sell or convey legal and beneficial interests in the property.
Standing alone, a strict application of the language of subsection (1) might appear to support the conclusion that the two Morris brothers own the family property in fee simple and may dispose of it as they see fit. Though early eases interpreting the language of subsection (1) recognized that it vested fee simple title with broad powers in the grantee, it was “likewise true that such a conveyance will not preclude a Court of Equity from declaring this to be a resulting trust, unless there be prior equities that will prevent such being done.” Arundel Debenture, Corp. v. Le Blond, 139 Fla. 668, 190 So. 765, 767 (1939) (distinguishing Willys-Overland v. Blake, 97 Fla. 626, 121 So. 884, 885 (1929), which held that the statute vested a “fee-simple estate, with .full power and authority to sell, convey, and grant both the legal and beneficial interest in the real estate”); see also Norton v. Jones, 83 Fla. 81, 90 So. 854 (1922) (discussing application of statute).
These older cases must now be read in a different light because, although subsection (1) has remained virtually unchanged *720 over the last century, it was joined in 1959 by neighboring subsections (2)-(5), including subsection (4), which in relevant part says: .
■ (4) Nothing herein contained shall prevent any person from causing, any declaration of trust to be recorded before or after the recordation of the instrument evidencing title or ownership of property in a trustee; nor shall this section be construed as preventing any beneficiary under an unrecorded declaration of trust from enforcing the* terms thereof against the trustee ...
§ 689.07(4), Fla. Stat. (emphases added). Though no reported case has mentioned subsection (4) since its addition over five decades ago, its apparent purpose was to temper potentially harsh readings of subsection (1) that could marginalize the interests of trust beneficiaries. Two important legal points emerge. First, subsection (4) says that nothing in the statute precludes any person from recording a trust agreement before or after the recordation of á deed or other' “instrument evidencing title or ownership of property in a trustee[.]” It thereby permits' the recordation of a trust agreement after a deed’s recordation, even decades later, which is what happened here. Second; subsection (4) entitles any beneficiary to enforce the terms of a declaration of trust, even' if unrecorded. For example, had the Trust Agreement not been recorded, any of the six Morris siblings would nonetheless be authorized to enforce it by suing John and Robert as co-trustees. Subsection (4) counterbalances subsection (1) in two important ways. One is* that it allows previously unrecorded trusts (“secret” trusts discussed below) to be-recorded as a means of protecting the interests of beneficiaries and innocent third parties by providing public notice of a trust’s existence. The other is its recognition that trusts, even if unrecorded, may be enforced by beneficiaries against their trustees. In either instance, a focus of subsection (4) is the protection of beneficiaries. *
The trial court misconstrued subsection (4), believing that “the 2004 - statutory amendment expressly allowed the recording of a trust agreement years after- a warranty deed to grantees ‘as trustees’ is clearly not intended to deprive grantees of the presumptive fee simple estate to which the then ‘standard practice in Florida’ assumed they would receive.” Putting aside that subsection (4) was added in 1959, not 2004,[3] this view of its purpose and interrelation with subsection (1) is mistaken.
Subsection (l)’s . presumption of a grantee-trustee’s fee ownership of a subject property is designed .to protect innocent third parties from “secret” trusts that are neither mentioned on the face of recorded deeds nor otherwise made known in the public records. The central purpose of subsection (1) is to protect those who might rely, upon, the public record when dealing with the grantee, such as an innocent purchaser of property, who knows only that the deed’s grantors are trustees of an unidentified and unrecorded trust. As our supreme cQurt recently said:
the Legislature enacted section 689,07(1) for the purpose of preventing secret trusts to protect those “who might subsequently rely upon the record when dealing with the grantee.” Arundel Debenture Corp. v. Le Blond, 139 Fla. 668, 190 So. 765, 767 (1939) (construing the predecessor statute to section 689.07(1)); see also One Harbor, [Fin. Ltd. Co. v. Hynes Props., LLC, 884 So.2d 1039, 1043 (Fla. 5th DCA 2004) ]. (“The pur *721 pose of section 689,07 is to protect persons who rely upon the public land , records to ascertain title to real property , when a beneficiary’s interest is .not disclosed in the grantor/grantee index by either the deed transferring title or a recorded declaration of trust.”). “The statute prevents ‘secret trusts’ that impede the exchange of marketable title by vesting both the legal and beneficial interest in the trustee, unless a contrary intention appears in the deed or .conveyance, or a declaration of trust is recorded.” One Harbor, 884 So.2d at 1043_ This concern regarding secret trusts is not present if the “deed or. conveyance of real .estate” sufficiently informs a third party that the grantor’s intent was only to convey mere legal title. In such a case, a- third party is on notice that the grantee only holds the property in trust.
Raborn v. Menotte, 974 So.2d 328, 332 (Fla.2008) (determining whether property conveyed by deed ■ and attempted to be held in- trust was part of the bankruptcy estate)... Because the-deed in Rabom identified the name and date of the trust and bore “numerous references to the trust agreement, the settlors, and the .beneficiaries,” it sufficiently informed third parties, putting them on notice that the grantee held only legal title in trust. Id. By implication, persons who are aware of a trust agreement, the names of settlors and beneficiaries, and so on, are beyond the ambit of persons protected by subsection (1).
On this point, it bears singular emphasis that John falls far outside the class of unwitting third parties unaware of the Trust Agreement. Unlike third parties who don’t know the Trust Agreement exists and lack information about the trust’s purpose and its beneficiaries, John — as named co-trustee and beneficiary — has known for over thirty years of the existence of the family trust (which he signed), including his fiduciary role as a trustee. He’s not an uninformed outsider for whom subsection (1) provides protection from “secret” trusts that are neither- recorded nor disclosed; he’s the wholly-informed insider answerable to trust beneficiaries to whom- he owes solemn responsibilities under the Trust Agreement. - He has no basis whatsoever for invoking subsection (1)- as a means for transforming what is trust property benefiting six siblings into personal property benefiting two. Instead, he is answerable to “any beneficiary” seeking fto enforce the Trust Agreement against him under subsection (4). Whatever declared presumption that subsection (1) creates as to property- ownership can be overcome by a showing under subsection (4) that the'property is subject to an unrecorded trust agreement, one that can be recorded after the subject deeds have been recorded. Subsection (4) allows for such recordation and the enforcement of the terms of a trust “against the trustee” to effectuate its purpose, which establishes the-standing of beneficiaries, such as Connie, to . bring or intervene in proceedings affecting their interests.
In short, the trial court’s order, which paralleled the statutory' misconstruction that co-trustee John advocated, erred by failing to read section 689.07 as a whole. When subsections (1) and (4) are read together, it is evident'that the Legislature intended to protect two categories of persons: innocent third parties, such as purchasers or creditors, and beneficiaries of recorded and unrecorded trusts. There being no third parties to protect vis-a-vis the Morris Family Plantation, subsection (1) plays no role in this case; instead, the operative provisions are those in subsection (4), which exist to protect the rights of beneficiaries, here the six Morris siblings. On this record, no legitimate dispute exists that a valid trust exists: the deeds, the Trust Agreement, and the father’s letter were executed around the samé time, collectively demonstrating that the Morris *722 Grove Plantation was to be held and operated in trust for all the siblings. Co-trustee John’s alleged absolute ownership of the family’s homestead in fee simple is inconsistent with that intent. See, e.g., Reid v. Barry, 93 Fla. 849, 112 So. 846, 854 (1927) (“Absolute control and power of disposition are inconsistent with the idea of a trust.”).
III.
The order of the trial court is reversed and remanded with instructions to enter judgment against John E. Morris III.
REVERSED and REMANDED.
LEWIS and WETHERELL, JJ., concur.

. The Trust Agreement stated that it "shall not be placed on record in the county in which the Trust property is situated or elsewhere, but if it is so recorded 'such recording shall not be considered as notice of the rights of any person under this Agreement derogatory to the title or powers of the Trustees.” This type of clause, which is commonplace in private trusts, see, e.g., Florida Jurisprudence Forms Legal & Business, Recordation of Trust Instrument § 34:594 (2015) (providing standard language for prohibiting recordation of a trust instrument), is designed to advance the settlor’s intent of preventing public disclosure of the terms of a trust and thereby protecting the privacy of beneficiaries. See generally Frances H. Foster, Trust Privacy, 93 Cornell L.Rev. 555 (200’8) (discussing the pros/cons of the use of trust privacy provisions). Trust privacy has many benefits, which a non-recor-dation clause advances. But circumstances exist where a trust agreement must be recorded, as the language' in the Trust Agreement envisions ("but if it is so recorded”); such as when a beneficiary is attempting to establish the enforceability of a trust, as was done here. Recordation for such a-purpose does not violate the central purpose of the trust's non-recordation clause.-

. Sister Connie successfully intervened as an indispensable party but the triabcourt denied her relief from judgment because she “raisefd] no arguments not previously considered.” Connie filed an appeal, which we consolidated with this case. Because we reverse the trial court’s order in its entirety, effectively granting the relief Connie seeks, we need not address the issues raised in her appeal.

. The 2004 améndment, which did not alter subsection (4), revised the criteria for granting certain estates, transferring and assigning certain interests, and vesting rights in certain deeds. See Ch. 2004-19, Laws of Florida.